RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 8/18/15

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| DARREL GRANT LEDEE,<br>Plaintiff | CIVIL ACTION (b)<br>SECTION "P"<br>NO. 14-CV-00096 |
| VERSUS | |
| DAVID MORR, et al.,<br>Defendants | JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983, in forma pauperis, by pro se plaintiff Darrel Grant LeDee ("LeDee") on January 16, 2014 (Doc. 1) and amended on June 18, 2014 (Doc. 13). The remaining named defendants are Patricia Thomas ("Thomas") (the medical director at Winn Correctional Center ("WCC") in Winnfield, Louisiana), Corrections Corporation of America ("CCA") (operator of WCC), and Trinity Service Group, Inc. ("Trinity") (the food service provider at WCC, incorrectly referred to in the complaint as "Canteen Food Services").

LeDee complains that, while he was incarcerated in WCC, he was denied medical care and appropriate food for his anemia,

malnutrition, severe weight loss, and Crohn's Disease. LeDee contends he weighed 155 pounds when he entered WCC, but now weighs only 117 pounds. LeDee contends that a high calorie diet was prescribed for him by the medical department, but Trinity refused to allow the food service employees to provide LeDee with an appropriate diet, Thomas cancelled the diet plan, and CCA refused to authorize LeDee's special diet. LeDee contends that, when he complained about the cancellation of his special diet to Thomas, she told him that CCA could cancel any medical treatment prescribed by a doctor, and then wrote LeDee up in retaliation for his complaints. For relief, LeDee asks for a jury trial and monetary damages (including punitive).

CCA answered the complaint (Doc. 28). Trinity filed a motion to dismiss which is actually a motion for summary judgment (Docs. 48, 65, 73), then filed an answer (Doc. 67). LeDee filed a brief opposing the motion for summary judgment (Doc. 69).[1] CCA filed a motion for summary judgment (Docs. 73, 74).

Defendant Thomas was never served (Doc. 27). Accordingly, it will be recommended that the complaint against Thomas be dismissed without prejudice under Fed.R.Civ.P. 4(m). See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293 (1994); Systems Signs Supplies v. U.S. Dept.

---

[1] LeDee's motion for entry of default and to strike is mislabeled as a motion for summary judgment on the docket sheet (Doc. 70).

of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

The motions for summary judgment are now before the court for disposition.

## Summary of Medical Records

LeDee was transferred to WCC in December 2005 from Caldwell Correctional North (Doc. 30, Ex. 1, p. 38.450; Doc. 48, Ex. 1, p. 38/450). LeDee's medical transfer summary from Caldwell Correctional North stated that he had a history of insomnia, and depression and had not eaten in six days (his mother and daughter had both just died) (Doc. 30, Ex. 1, p. 381/450). LeDee's December 2005 WCC health appraisal states that he is 5'10" tall and weighed 139 pounds (Doc. 30, Ex. 1, p. 40/450). WCC lists LeDee's mental health problems as major depression, impulse control disorder, psychosis NOS, and anxiety NOS (Doc. 30, Ex. 2, p. 352/450). On December 13, 2005, LeDee weighed 139 pounds (Doc. 30, Ex. 1, p. 40/450).

LeDee's Department of Public Safety and Corrections Master Record shows that LeDee is 5'11" tall and weighed 135 pounds in 2006 (Doc. 30. Ex. 2, p. 317/450). At a health screening on January 3, 2006, LeDee was six feet tall and weighed 145 pounds (Doc. 30, Ex. 2, p. 315/450).

On July 11, 2006, LeDee weighed 142 pounds (Doc. 30, Ex. 2, p. 16/450) and on July 14, 2006 he weighed 136 pounds (Doc. 30, Ex. 2,

p. 6/450). On August 15, 2006, LeDee weighed 148 pounds (Doc. 30, Ex. 2, 5/450). LeDee complained in July 2008 that he was losing weight and needed a special diet, and he was told to make a sick call (Doc. 30, Ex. 1, p. 17/450). On October 18, 2007, LeDee weighed 150 pounds (Doc. 30, Ex. 1, p. 411/450). On September 22, 2008, LeDee weighed 131.6 pounds, on October 15, 2008, LeDee weighed 135 pounds, and on December 1, 2008 he weighed 136 pounds (Doc. 30, Ex. p. 406-407/450).

In 2009 and 2010, LeDee suffered from a fractured and infected tooth for which he had surgery (Doc. 30, Ex. 2, pp. 27-40, 284/450). On December 9, 2009 and February 25, 2010, LeDee told Mental Health that he was not able to eat (to take his medication with food) because of his dental problem (Doc. 30, Ex. 2, p. 55, 68/450). LeDee also complained to the medical department, in 2009, that his tooth pain prevented him from eating and caused extreme headaches and dizziness (Doc. 30, Ex. 1, pp. 10-14/450). There do not appear to be any WCC medical records which include LeDee's weight in 2009 and 2010.

LeDee was given permission to go to "medical" daily to get his Boost (or generic equivalent) on January 27, 2011 On April 1, 2011 (Doc. 30, Ex. 1, p. 318/450). LeDee's medical records show that, on April 1, 2011 LeDee complained that his Nutrition Support Diet had been cut back, but on May 5, 2011 LeDee was informed that it had been ordered (Doc. 30, Ex. 1, p. 6/450). LeDee's WCC medical

4

records also show that the doctor prescribed him a nutrition support diet from October 22, 2009 through October 22, 2010 (Doc. 30, Ex. 2, p. 282/450), a nutrition support diet and shakes from October 28, 2011 through April 28, 2012 (Doc. 30, Ex. 1, pp. 275, 333/450), a nutrition support diet from December 12, 2009 through June 12, 2010 (Doc. 30, Ex. 1, p. 280/450), a nutrition support diet from May 19, 2010 through May 19, 2011 (Doc. 30, Ex. 1, p. 277/450), a nutrition support diet from April 22, 2011 through April 22, 2012 (Doc. 30, Ex. 1, p. 276/450), nutrition support with shakes at each meal from October 28, 2011 through April 28, 2012, and nutrition support with shakes at each meal from February 20, 2012 through February 10, 2013 (Doc. 30, Ex. 1, p. 269-270, 274/450). LeDee complained in November 2011 that Pat Thomas had told him that his prescribed diet and Boost had to be approved by CCA; the response was that the Boost had been discontinued by the doctor on October 28, 2011 (Doc. 30, Ex. 1, p. 5/450). Therapeutic diet requests were made for each of these diet prescriptions.

In February 2012, LeDee weighed 127 pounds (Doc. 30, Ex. 2, p. 414/450). On February 10, 2012, LeDee was prescribed three Boost shakes per day (Doc. 30, Ex. 1, p. 2/450). LeDee weighed 127.4 pounds on July 5, 2012 (Doc. 30, Ex. 1, p. 325/450). On June 7, 2012, LeDee complained that he wanted the Boost and nutrition support diet again due to his Crohn's disease, dizziness, weakness, and constant hunger; he weighed 133 pounds (Doc. 30, Ex. 1, p.

5

306/450). On July 5, 2012, LeDee weighed 127.4 pounds (Doc. 30, Ex. 1, p. 325/450). On November 1, 2012, LeDee complained of abdominal pain and weight loss; he weighed 122 pounds (Doc. 30, Ex. 1, p. 319/450). On November 1, 2012, Ledee weighed 122.8 pounds (Doc. 30, Ex. 1, p. 310/450). A nutrition support diet was prescribed for LeDee from September 5, 2012 through September 5, 2013 (Doc. 30, Ex. 1, p. 268/450), and a nutrition support diet from November 29, 2012 through November 29, 2013 (Doc. 30, Ex. 1, p. 267/450). LeDee was also given permission to go to "medical" daily to get his Boost (or generic equivalent) on March 5, 2012 and January 30, 2013 (Doc. 30, Ex. 1, p. 318/450).

On February 22, 2013, LeDee weighed 127 pounds (Doc. 30, Ex. 1, pp. 315-317/450). In May 2013, LeDee complained he was not being given a 3500 calorie/day diet and his weight was dropping (Doc. 30, Ex. 1, p. 310/450). On June 7, 2013, LeDee weighed 135 pounds (Doc. 30, Ex. 1, p. 306/450). On October 30, 2013, LeDee weighed 122.6 pounds and complained of weight loss due to not getting enough food (Doc. 30, Ex. 1, p. 290-291/450 and Ex. 2, p. 395/450). On June 5, 2014, LeDee weighed 132 pounds (Doc. 30, Ex. 2, p. 394/450). On November 10, 2014, LeDee weighed 124 pounds (Doc. 30, Ex. 2, p. 388/450; Doc. 30, Ex. 3, p. 34/37).

Law and Analysis

Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that

the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999),

and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

Medical Care

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976). A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities. Second, a prison official must have a sufficiently culpable state of mind, i.e. deliberate indifference to a prisoner's constitutional rights, to be subjected to a § 1983

liability to that prisoner. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994).

The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980 (1994). Because an inadvertent failure to provide adequate medical treatment does not violate the Eighth Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition. Estelle, 97 S.Ct. at 291. Disagreement with medical treatment also does not state a claim for Eighth Amendment indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

9

Trinity

Trinity filed a motion for summary judgment contending that LeDee's request for compensatory damages is barred because he cannot show a physical injury. Trinity contends the evidence shows LeDee has not suffered a weight loss, that his weight has remained constant, and that his weight is in a normal, healthy range. Trinity also argues that LeDee's claim against Trinity is improperly based on respondeat superior liability, and that LeDee has not shown that he was subjected to unconstitutional conditions of confinement.

Defendants provided an affidavit from Laurie LeClair, a licensed dietician who was the Regional Dietician for Trinity between March 2012 and April 2014 and is currently the Director of Menu Development for Trinity (Doc. 48, Ex. 3). LeClair states in her affidavit that she investigated LeDee's claim against Trinity and found that, during the relevant time, Trinity prepared meals for LeDee in accordance with the diet prescribed for him by the CCA/WCC medical department, which is known as the Nutrition Support Diet (Doc. 48, Ex. 3). LeClair states in her affidavit that the Nutrition Support Diet is generally prescribed for inmates with hypermetabolic conditions such as cancer, HIV positive, or chronic metabolic conditions causing accelerated weight loss (Doc. 48, Ex. 3). LeClair explains in her affidavit that the Nutrition Support Diet consists of three full meals per day plus an after dinner

snack seven days per week, which are the same meals served to the inmates without dietary restrictions but which are enhanced item portions that provide about 500 additional calories per day (Doc. 48, Ex. 3). LeClair also explains that, per the CCA/WCC medical department, the Nutrition Support Diet does not include a nutritional shake like Ensure or Boost, that such shakes are distributed to inmates at WCC by the medical staff at their discretion, and that Trinity has no involvement or input in determining which inmates receive nutritional shakes (Doc. 48, Ex. 3). LeClair further states in her affidavit that Trinity did not have a policy, practice or custom of knowingly preparing meals for the WCC inmates that were nutritionally deficient or contrary to any medically prescribed dietary restrictions (Doc. 48, Ex. 3).

LeClair states in her affidavit that LeDee's medical records concerning his height and weight measurements at WCC show he was 5' 10" tall and weighed 131 pounds on January 22, 2015, which is a Body Mass Index ("BMI") of 18.8 (Doc. 48, Ex. 3). On February 28, 2015, LeDee weighed 136 pounds and had a BMI of 19.5 (Doc. 48, Ex. 3). LeClair states in her affidavit that 18.8 and 19.5 are both within the normal BMI range for LeDee's height (Doc. 48, Ex. 3).[2]

---

[2] It is noted that, even if LeDee is 5'10" tall, instead of 5' 11" or 6', every time LeDee's weight fell below 131 pounds, his BMI went below a normal range, according to BMI calculations. See "Calculate Your Body Mass Index" at http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm, *provided by* the National Institutes of Health, National Heart, Lung and Blood Institute.

Trinity's statement of undisputed facts (Doc. 48, Ex. 2) includes the same information that is in LeClair's affidavit. Two uncertified medical records, showing LeDee was prescribed nutrition support on November 1, 2014 and November 24, 2014 are attached to LeClair's affidavit (Doc. 48, Ex. 3).

Trinity also submitted an affidavit by Benjamin Sweat, who has been the Trinity Food Service Manager at WCC since November 2013 (Doc. 48, Ex. 4). Sweat states in his affidavit that CCA establishes the specifications for the menu for all meals that Trinity serves to the inmates at WCC, specifies the meal times, the type of food and beverages, and the portion sizes (Doc. 48, Ex. 4). Sweat further states that CCA requires Trinity to modify the portion sizes and substitute certain food items for inmates with medical and/or religious dietary restrictions (Doc. 48, Ex. 4). Sweat states in his affidavit that CCA policy governing medical diet prescriptions require the WCC medical department to prescribe medical diets for inmates and that, once prescribed, Trinity cannot modify or alter an inmate's medical diet absent specific authorization by WCC officials except to the extent necessary to respond to production problems, product availability and/or security issues (Doc. 48, Ex. 4). Sweat states in his affidavit that any substitutions that are necessary in those circumstances are generally made from the same food group specified under the pertinent menu and are of comparable nutritional value (Doc. 48,

12

Ex. 3). Sweat further states in his affidavit that he investigated LeDee's allegations against Trinity and found that Trinity prepared meals for LeDee in accordance with his prescribed diet, the Nutrition Support Diet, which consisted of enhanced item portions that provided about 500 additional calories per day (Doc. 48, Ex. 4). Sweat states in his affidavit that each of LeDee's meals were prepared by an inmate kitchen worker under the supervision of a Trinity supervisor who reviewed the menu to identify the items specified for his meal, and the inmate worker used a food scale and measuring scoops to ensure the meals contained the proper portions, then the fully assembled meal tray was inspected b a Trinity supervisor before it was served to LeDee (Doc. 48, Ex. 4). Sweat states in his affidavit that, to obtain meals, an inmate with a restricted diet must notify Trinity's tray line supervisor that he has a restricted diet, the supervisor then confirms the inmate's name is listed on a "diet roster" maintained by Trinity, the supervisor then retrieves the restricted diet meal and confirms the meal conforms with the diet's specifications and gives it to the inmate (Doc. 48, Ex. 4).

Sweat further states in his affidavit that LeDee's name appears on the most recent diet roster, which indicates the CCA/WCC medical department prescribed the Nutritional Support Diet for LeDee, but that he would not have received it if he did not notify Trinity's tray line supervisor about his restricted diet

13

prescription when he passed through the tray line. Sweat states that LeDee has, in the past, gone through the tray line twice for the purpose of consuming two unrestricted diet meals rather than the Nutrition Support Diet meal prepared for him (Doc. 48, Ex. 3). Finally, Sweat states in his affidavit that Trinity does not have a policy, practice or custom of knowingly preparing nutritionally deficient meals or meals that are contrary to any medically prescribed dietary restrictions (Doc. 48, Ex. 5). Trinity's statement of undisputed facts (Doc. 48, Ex. 2) includes the same information that is in Sweat's affidavit.

LeDee's medical records from WCC include FAXes between Dr. Michael Hegmann, an Arizona internist employed by CCA, and RN Ami Brunson at WCC. Brunson asked Dr. Hegmann, on January 3, 2012 and February 13, 2012, for approval of the therapeutic diet and shakes prescribed by Dr. Kuplesky for LeDee; Brunson noted that Dr. Hegmann had not answered the previous emails on the subject (Doc. 30, Ex. 1, pp. 271-272/450). Dr. Hegman sent an unsigned approval on February 13, 2012 (Doc. 30, Ex. 1, p. 271/450).

Trinity shows that it does nothing more than provide meals as ordered by CCA/WCC and that it has no control over who is provided with special diet trays. LeDee has offered no evidence to show that Trinity has any control over prescribing or approving special diets for inmates.

Although LeDee contends that LeClair and Sweat have refused to

give him special diet trays, he has not shown they did so when LeDee was on the roster to receive special diets. Moreover, as pointed out by Trinity, it is not liable, under 42 U.S.C. § 1983, in a supervisory capacity for the mistakes or misdeed by its employees. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

Since there are no genuine issues of material fact which would preclude a summary judgment in favor of Trinity, Trinity's motion for summary judgment should be granted.

CCA

CCA contends in its motion for summary judgment that LeDee has not shown that CCA specifically refused to provide him with his prescribed special diet, or that it has a policy, practice or procedure for failing to provide such diets. CCA concedes in its brief (Doc. 73) that LeDee has a serious medical need for the special diets because they have been prescribed for him by the prison physician.

It is not clear from the record before this court whether LeDee received the prescribed diets and booster shakes that were repeatedly prescribed by the WCC physician. It appears from the medical records that the physician's dietary prescriptions had to be approved by a CCA doctor in Arizona, Dr. Hegmann, before they could be implemented and that Dr. Hegmann did not give his approval or disapproval in a timely fashion.

CCA points out that LeDee was prescribed the diet he seeks by

Dr. Kuplesky; however, CCA fails to show whether Dr. Hegmann or some other CCA physician with oversight authority authorized LeDee's prescribed diets and booster shakes each time they were prescribed. There is nothing in the record concerning CCA's policies for providing special diets as prescribed by the prison physician.

LeDee states in his affidavit that he has received the "Nutrition Support Diet" three times since 2009 (Doc. 69). LeDee contends one of those occasions was when the Trinity food service supervisor gave him the meal with an additional 500 calories on January 9, 2015, but that Benjamin Sweat denied him that meal on January 10, 2015 (Doc. 69). LeDee further states in his affidavit that he only once ate two regular meal trays during one meal (Doc. 69).

WCC Medical Director Daniel Marr states in his February 5, 2015 affidavit that LeDee is still prescribed the nutritional support diet and is receiving those meals (Doc. 73). LeDee states in his affidavit that, on February 28, 2015, he was placed in lockdown by Warden Nicole walker and his special diets were cancelled (Doc. 69).

Therefore, there are genuine issues of material fact, as to whether CCA ignored or refused to provide the special diets that were prescribed for LeDee by Dr. Kuplesky, which preclude a summary judgment at this time.

<u>Conclude</u>

Based on the foregoing discussion, IT IS RECOMMENDED that LeDee's complaint against Pat Thomas be DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER RECOMMENDED that Trinity's motion for summary judgment (Doc. 48) be GRANTED and that LeDee's action against Trinity be DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that CCA's motion for summary judgment (Doc. 73) be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 18th day of August 2015.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE